UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| CASS, INC., a California corporation, | |
| Plaintiff, | 3:13-cv-00701-LRH-WGC |
| v. | ORDER |
| PRODUCTION PATTERN AND FOUNDRY CO., INC., a Nevada corporation, AKA PRODUCTION PATTERN & FOUNDRY, | |
| Defendant. | |

This is a contract dispute between plaintiff CASS, Inc., and defendant Production Pattern and Foundry Co., Inc. ("PPF") stemming from a series of contracts regarding CASS's sale of aluminum alloy to PPF. PPF has moved for summary judgment on all of CASS's claims (ECF No. 107[1]), and CASS has moved for partial summary judgment on its two separate breach-of-contract claims (ECF Nos. 108–09[2]). PPF has also moved to strike various exhibits that CASS included in its summary-judgment motions (ECF No. 117[3]), while CASS has filed objections to several of PPF's filings (ECF Nos. 119, 120, 130, 131, and 132[4]).

---

[1] CASS has filed a response (ECF No. 118), to which PPF replied (ECF No. 124).

[2] PPF has responded to both of CASS's partial summary-judgment motions (ECF No. 115–16), and CASS has replied (ECF No. 126–27).

[3] CASS has filed a response (ECF No. 128), to which PPF replied (ECF No. 133).

[4] PPF has filed a notice of non-response to CASS's objections, asserting that they are merely repetitive form objections and offering to file a response upon court order. ECF No. 125.

For reasons discussed below, the court will deny both parties summary judgment on CASS's first breach-of-contract claim. The court will, however, grant CASS summary judgment on its second contract claim, but only as to the unpaid invoice balance and not the contractual interest. Moreover, the court will grant PPF summary judgment on CASS's unjust-enrichment and quantum-meruit claims but deny it summary judgment on the breach of the implied covenant of good faith and fair dealing. The court will also deny PPF's motion to strike.

**I.    Background**

CASS is an aluminum distributor[5] for non-party Alcoa, an aluminum producer. PPF is a Nevada-based foundry that works exclusively with aluminum alloy. Because PPF is a relatively small enterprise, it is unable to buy aluminum directly from Alcoa and thus contracts with CASS. One of PPF's clients is non-party PACCAR, a truck manufacturer. Prior to the dispute at issue, PPF purchased aluminum alloy primarily from CASS and used the aluminum to produce aluminum castings for PACCAR.

This supply chain and its underlying contracts are best understood in reverse. PACCAR would place orders with PPF for aluminum castings. PACCAR does *not* have a contractual relationship with either PPF or Alcoa. In order to produce the requested parts for PACCAR, PPF would order aluminum alloy directly from CASS through a contractual relationship that will be described shortly. CASS would then contract with Alcoa to fill PPF's aluminum orders. Alcoa does not have a contractual relationship with PPF or PACCAR.[6]

Prior to the beginning of each new calendar year, PPF would estimate its aluminum needs for that upcoming year based on projected orders provided by PACCAR. PPF would then contract with CASS, committing to purchase a specific quantity of aluminum from CASS for the upcoming year for a fixed price per pound. The parties refer to this type of transaction as a "hedge." These contracts would take the form of a "sales order" sent from CASS to PPF,

---

[5] While CASS refers to itself as an aluminum "broker," PPF asserts that it is actually a distributor. There does not appear to be any legal relevance to this distinction.

[6] Despite this fact, PPF would receive shipments of aluminum directly from Alcoa rather than from CASS. The parties do not highlight any legal significance to this fact.

specifying the pounds of aluminum that PPF was committing to purchase and the fixed price per pound.[7] *E.g.*, ECF No. 107-1 at 9.

The benefit of forming a hedge is that PPF is guaranteed the contracted fixed price per pound for that quantity of aluminum, even if the current market price of aluminum alloy increases during the calendar year.[8] ECF No. 108 at 4. Conversely, there is a risk that the market price can fall below the fixed price, resulting in PPF being contractually obligated to purchase aluminum at a higher-than-market price. *Id*. Additionally, as demonstrated in this dispute, PPF is obligated to purchase the contracted *quantity* of aluminum, even if PPF's actual demand for aluminum during the year falls short of this amount.

In order to supply PPF the contracted quantity of aluminum at a fixed price, CASS would separately contract with Alcoa for a corresponding quantity at a fixed price. *Id*. at 5. In order to guarantee this fixed price, Alcoa would hedge the quantity of aluminum in the futures market. *Id*. Accordingly, the quantity of aluminum ordered by PPF for a particular year could not be adjusted, a fact reiterated in the relevant sales orders between CASS and PPF, as well as the contracts between Alcoa and CASS. *E.g.*, ECF No. 107-1 at 9.

Although PPF would contractually commit to purchasing a fixed quantity of aluminum for the next calendar year, it was not required to either receive or pay for the entire quantity up front. Instead, PPF would periodically send CASS purchase orders throughout the contracted year for a specific quantity of aluminum that PPF needed in order to fill PACCAR's orders. ECF No. 106 at 4. Each purchase order would be drawn from the total contracted quantity and shipped to PPF. *Id*. CASS would then invoice PPF for that specific aluminum shipment, with payment due within thirty days.

PPF asserts that the sales orders did not require it to commit to a firm delivery schedule with CASS—i.e., one in which PPF was required to receive monthly shipments of a fixed or

---

[7] In order to help distinguish between the contracts between CASS and PPF and other contracts related to this dispute, the court will exclusively refer to the CASS-PPF contracts as "sales orders."

[8] PPF alleges that it passes on its aluminum costs to PACCAR and thus enters into hedge contracts for PACCAR's benefit. ECF No. 106 ¶ 5.

minimum quantity of aluminum. *Id*. PPF alleges that it could not commit to a firm delivery schedule and that a long-term custom and practice had developed between itself and CASS, whereby PPF would only place purchase orders with CASS based on PPF's "current production requirements." *Id*. In other words, PPF would not order aluminum from CASS until after PPF had received a production order from PACCAR. *Id*. PPF alleges that it would normally place orders with CASS on a weekly or semi-weekly basis. *Id*. At no point does CASS directly address this contention or offer a conflicting narrative.

During the summer of 2007, CASS and PPF entered into three separate sales orders to provide PPF with aluminum alloy at a fixed price for 2008. It is undisputed that these sales orders were later consolidated into a single contract, Sales Order 17675 (the "2008 sales order"), wherein CASS agreed to sell and PPF agreed to purchase 3,060,000 lbs. of aluminum alloy at a fixed price per pound. ECF No. 108 at 4–5; ECF No. 107-1 at 9.

At this juncture, the case's facts diverge into two streams. CASS has brought two separate breach-of-contract claims, and each factual stream is relevant to a different claim.

### A.    First breach-of-contract claim

This first claim is premised on the undisputed fact that PPF did not purchase over 400,000 lbs. of aluminum from the 2008 sales order. The claim is also premised on the undisputed fact that PPF did not purchase any of the aluminum from the 2009 sales orders,[9] which are described immediately below.

///

///

---

[9] Both parties refer to the sets of sales orders differently. PPF refers to the sales order that was executed in 2007 and that originally called for aluminum deliveries in 2008 as "Sales Order 17675." CASS refers to this contract as the "2008 sales order" or "2008 hedges." Similarly, PPF refers to the sales orders that were executed in 2008 and that originally called for aluminum deliveries in 2009 as the "2008 sales orders," while CASS refers to them as the "2009 sales orders" or "2009 hedges." Because the year the parties executed the contracts is mostly irrelevant, the court will refer to the first contract, which called for the delivery of aluminum in 2008, as the "2008 sales order" and refer to its underlying goods as "2008 aluminum." The court will therefore refer to the contracts that called for delivery in 2009 as the "2009 sales order" and refer to its underlying goods as "2009 aluminum."

**1.     Modification of 2008 sales order & formation of 2009 sales orders**

Due to the economic downturn that began in 2007, PPF realized in May 2008 that, for the first time in its relationship with CASS, it would not be able to purchase all of the hedged aluminum it had contractually committed to purchasing. ECF No. 106 at 5. Thus, in mid-2008, CASS agreed to allow PPF to "carry over" the unused portion of the 2008 aluminum into 2009 at a penalty of .005 cents per pound per month. *Id*.

There is a lack of clarity, however, regarding the terms of this modification. PPF asserts that the modification of the 2008 sales order allowed PPF to carry over the unused portion of the 2008 aluminum until the end of 2009. *E.g.*, *id*. Because there was a per-month penalty, the longer into 2009 it took PPF to purchase the 2008 aluminum, the higher the penalty per pound would be. Conversely, CASS asserts—for the first time in its first summary-judgment motion—that "PPF was expected to take delivery of the remaining aluminum in January and February 2009." ECF No. 108 at 5. CASS never explains this assertion.

Nonetheless, it is undisputed that, at the same time that PPF and CASS negotiated the modification of the 2008 sales order, they entered into several sales orders for 2009 (collectively "2009 sales orders"). These sales orders, like each prior sales order, guaranteed PPF a quantity of aluminum at a fixed price—in this case, 1,587,000 lbs. of aluminum in total. *Id.* at 6. But unlike the original 2008 sales order, the 2009 sales orders contained an explicit provision that allowed PPF to carry over any unused aluminum from 2009 into 2010: "Total contracted tonnage must be taken during the contracted terms. Tonnage **forwarded into 2010** at a $.005/LB penalty per month." ECF No. 107-1 at 16–19 (emphasis added). These sales orders each set a delivery schedule of quarter 2 through quarter 4 of 2009. *Id.*

As discussed above, CASS would contract with Alcoa each year in order to fill its sales orders with PPF. Thus, the 2008 contracts between Alcoa and CASS ("2008 Alcoa contracts") supplied the aluminum that was guaranteed in the 2008 sales order between CASS and PPF for the latter's purchase of aluminum in 2008—with CASS permitting PPF's carry over into at least some portion of 2009 at a penalty. ECF No. 106 at 4–5; *see also* ECF No. 107-1 at 12–14. Similarly, the 2009 contracts between Alcoa and CASS ("2009 Alcoa contracts") supplied the

aluminum that was guaranteed in the 2009 sales orders between CASS and PPF—with CASS permitting PPF's carry over into 2010 at a penalty. ECF No. 106 at 4–5; *see also* ECF No. 107-1 at 21–24.

### 2.    Alcoa alters its hedging policies

PPF asserts that the carry-over policy in the modification of the 2008 sales order and the 2009 sales orders partially mirrored provisions in CASS's 2008 and 2009 contracts with Alcoa. The 2008 Alcoa contracts state, "A rescheduling fee of $.005/lb per month will be levied to move any tonnage beyond the hedged month." ECF No. 107-1 at 12–14. The 2009 contracts had a similar but not identical provision: "If you reschedule any or all committed tonnage for a given month[,] a rescheduling fee will be assessed at the quoted by our broker to move any tonnage beyond the hedged month."[10] *Id.* at 21–24. PPF thus asserts that, by allowing PPF to carry over its unused 2008 and 2009 aluminum into 2009 and 2010 respectively, CASS was merely exercising a similar contractual right in its own contracts with Alcoa.

However, on October 14, 2008, less than a week after CASS executed the 2009 Alcoa contracts, Alcoa wrote to CASS informing it that Alcoa had "revised" its hedging service. *Id.* at 61. In order to carry over a hedged month, CASS would now need to seek approval from one of Alcoa's vice presidents. *Id.* Three months later, on January 22, 2009, an Alcoa sales director emailed a CASS representative informing him that, "[s]ince about a week ago[,] [Alcoa] management is not allowing us to roll positions forward anymore." *Id.* at 63.

One week later, on January 29, Alcoa emailed CASS, informing it that Alcoa would "no longer move fixed price metal positions forward." *Id.* at 167. Alcoa elaborated that its new position meant that CASS would have to either (1) take the aluminum "as priced for the respective monthly quantities" or (2) "the hedge, or a portion of the hedge will need to be 'unwound' and the mark to market difference will be invoiced . . . ." *Id.*

///

---

[10] The 2009 Alcoa contracts each seem to be missing the word "rate" or "penalty: "a rescheduling fee will be assessed at the [rate or penalty] quoted by our broker to move any tonnage beyond the hedged month."

"Unwinding" or "ringing out" a hedge refers to rescinding the contract, which entails the buyer paying the difference between the aluminum's contract price and its market price at the time of rescission. ECF No. 106 at 8.

### 3. CASS makes demands of PPF regarding the 2008 & 2009 sales orders

On February 2, 2009, CASS emailed PPF, informing it that, until PPF returned to "the weekly payment program," CASS could not ship any additional aluminum to PPF. ECF No. 108 at 8; ECF No. 108-3 at 74. This reference, although relevant to this first breach-of-contract claim, appears to stem from CASS's second claim, which involves PPF not paying the balance on several invoices for purchase orders it placed under the 2008 sales order. However, this is the only mention in either of CASS's summary-judgment motions of a weekly payment plan, and CASS provides no elaboration.

On February 13, a conference call took place between PPF and CASS officers and sales representatives. PPF asserts—and CASS does not appear to dispute—that CASS made two primary demands of PPF during this call. ECF No. 106 at 9. First, CASS demanded that PPF convince PACCAR[11] to form a contract committing to either (1) take possession of the remainder of the unused 2008 aluminum (from the 2008 sales order) *or* (2) unwind the hedges for the remaining aluminum.[12] *Id*. Second, CASS demanded that PPF convince PACCAR to consent to CASS and PPF modifying the 2009 sales orders to negate the provision allowing PPF to carry over the 2009 aluminum into 2010. *Id*.

The parties do, however, dispute whether CASS presented these demands as an ultimatum. PPF alleges that CASS threatened to stop shipping aluminum to PPF starting April 1, 2009, if PPF did not agree to its demands. *Id*.

///

---

[11] Although PACCAR is not a party to the CASS-PPF sales orders, CASS was presumably attempting to involve PACCAR in these contract modifications because PPF passes on its aluminum costs to PACCAR and thus enters into hedge contracts for PACCAR's benefit. *See supra* n.8.

[12] Presumably, PPF and/or PACCAR, rather than Alcoa or CASS, was expected to absorb the cost of unwinding the hedge.

7

### 4. Emails between CASS, PPF, & PACCAR regarding CASS's demands

In support of its assertion, PPF highlights several emails it sent to CASS and PACCAR over the following month.[13] On February 16, 2009, PPF emailed CASS to summarize what terms PPF believed it was expected to present PACCAR based on the February 13 conference call. ECF No. 107-2 at 26. Because the email is presented as bullet points, the content is not completely clear. However, PPF explicitly wrote, "Without these agreements in place PPF/PACCAR takes a risk in Alcoa-CASS stop[ping] shipment of supporting alloys by April 1st." *Id*. CASS allegedly never contradicted this email, but rather forwarded it on to Alcoa. ECF No. 106 at 9; ECF No. 107-1 at 178.

On February 25, PPF once again emailed CASS, "mak[ing] sure" it understood Alcoa's demands before communicating them to PACCAR. ECF No. 107-2 at 28. PPF made no mention of CASS's alleged threat to halt aluminum shipments; however, PPF did discuss CASS's demand that PACCAR contractually agree to negate "the 'current carry forward option' and [put] in place an agreement to unwind 2009 hedges as they are unused." *Id*. CASS replied that "[e]verything looks fine." *Id*. at 29. That same day, PPF emailed PACCAR, outlining the following demands by CASS:

> CASS/Alcoa will allow PPF to continue to carry the 2008 contract forward into Qtr 2 without unwinding the hedges.
> CASS/Alcoa needs, from PACCAR, a signed contract negating the current "carry forward option" and in place an "agreement" to unwind 2009 hedges as they are unused.

*Id*. at 31. PPF further stated that "Alcoa has made it clear to our broker that they will no longer be offering this carry foreword option and it is imperative that this issue gets resolved prior to April 1st or our broker has instructed us that Alcoa/CASS will stop shipment of aluminum until we can resolve this matter." *Id*. PPF then forwarded this email to CASS. *Id*.

///

---

[13] Beyond the emails discussed below, PPF has provided notes from the conference call handwritten by its senior vice-president, Stephen Cochran. ECF No. 107-2 at 23–24. The bullet points do cover CASS's demands and state the following: "Alcoa–Hedges. W/o a revised contract Alcoa/CASS will stop shipment April 1st." *Id*.

PPF alleges that on March 3, 2009, CASS, due to demands from Alcoa, pushed the April 1 deadline for acceding to the above-mentioned demands forward to March 6. ECF No. 106 at 10. PPF cites to an email from CASS in which CASS stated that Alcoa would "liquidate"—presumably unwind—the hedges for the 2008 sales order by March 6 unless PPF provided a "commitment to close out the 2008 hedges or a consumption plan for the outstanding hedged material in March & April that all stake holders can agree to." ECF No. 107-2 at 38. CASS further stated it would "also need to have a real understanding of 2009 hedges (4 truck loads a month)[,] which start April 1st[,] and planned consumption." *Id*. The following day, PPF emailed these demands and the March 6 deadline to PACCAR and forwarded this email to CASS. *Id*. at 48.

On March 6, PPF emailed CASS, informing it that "PACCAR is unwilling to sign any agreement that negates the current contract that is in place or to accept any costs associated with unwinding of the current hedges." *Id.* at 50. PPF also asked whether "Alcoa intends on stopping shipment if this does not get resolved[,]" stating that PPF is "concerned that PACCAR is trying to call Alcoa's bluff as to if they will stop shipping or not at the contracted price." *Id*.

On March 09, PPF sent CASS the following email:

> I received word form PACCAR and they are reluctant to sign into an agreement that would accept the unwinding of the hedges for 2008-2009. It is their position that PPF hold to the current contract in place and request CASS to seek relief from Alcoa[,] as it seems they are the ones attempting to modify the contract terms. I understand from past conversations that Alcoa was going to begin invoicing for these hedges and stop shipments until a new agreement was in place. Obviously PPF is unable to cover the cost for unwinding and stopping shipment to us would be even more devastating. Please ask Alcoa to reconsider these changes for all parties involved.

*Id*. at 56. CASS responded, asking how much aluminum PACCAR would commit to purchasing per month. *Id*. at 55. PPF replied that PACCAR would not commit to purchasing a fixed quantity of aluminum per month. *Id*. PPF then asked "CASS to honor the current contract in place and allow PACCAR/PPF to continue the practice of moving metal forward." *Id*. CASS did not respond to this email. ECF No. 106 at 11.

///

### 5. PPF purchases aluminum from another supplier & CASS denies threatening to stop aluminum shipments

On March 12, 2009, PPF placed an aluminum order with Custom Alloy Light Metals ("CALM"), one of CASS's rival distributors.[14] ECF No. 108-3 at 94. PPF continued placing orders with CALM throughout 2009 and 2010, ultimately ordering 1,760,731 lbs. and 2,470,231 lbs. respectively. *Id.* at 9 (citing ECF No. 108-3 at 94–126; ECF No. 108-4 at 1–85). PPF alleges that it began ordering from CALM in direct response to the alleged threats by Alcoa and CASS to stop aluminum shipments unless PPF acceded to their demands. ECF No. 106 at 12. PPF asserts that "[a]ny lapse in the delivery of aluminum to PPF would [have] cause[d] PPF to have to shut down completely." *Id*. Conversely, CASS alleges that PPF began purchasing from CALM in order to take advantage of the substantially lower aluminum prices available on the "spot market" due to the economic downturn. ECF No. 119 at 29.

On March 16, PPF informed CASS that it had placed an aluminum order with CALM. *See* ECF No. 107-2 at 58–59. The following day, CASS emailed PPF, stating that

> CASS intends to fill the existing contracts PPF placed on behalf of PACCAR for the 2008 & 2009 Hedged Contracts.
> CASS never indicated we would not ship material <u>unless PPF stopped making payments against the outstanding aging due to the large amount past due</u>.[15]
> To the contrary, if PPF would provide the shipping schedule as CASS has repeatedly requested, CASS would be happy to ship the balance of the 2008 Hedged Contract promptly to facilitate starting the 2009 Hedged Contract on time.
> . . . .
> CASS intends to ship your metal per the 2008 & 2009 Hedged Contract until they are complete unless PPF or PACCAR elects to unwind & realize the difference

---

[14] While PPF placed its first order with CALM on March 12, 2009, PPF had emailed the aluminum distributor as early as February 16, inquiring about the possibility of purchasing aluminum from it. ECF No. 107-2 at 61–62. This email exchange took place three days after the February 13, 2009 conference call where CASS allegedly threatened to stop shipping aluminum to PPF. In this email exchange with CALM, PPF states that it is "running into some contract issues with Alcoa" and that "PPF is being told that unless terms are modified that Alcoa will stop shipments come April 1st." *Id.* at 61.

[15] CASS's statement regarding an "amount past due" very likely refers to PPF being behind on its payments on invoices for the purchase orders it had already placed with CASS against the 2008 sales order—the factual basis for CASS's second claim.

either (positive or negative) for the material that will not be used, per [Alcoa's] request.

*Id*. (emphasis in original).

PPF immediately responded, stating that CASS's "email is contradictory to what [PPF] was told by CASS to ask of PACCAR." *Id*. at 58. PPF further asserted that "[o]n multiple occasions, [CASS] told [PPF] of April 1st being the cut off date (stop shipment of supporting alloys) if [PPF] could not get PACCAR to sign a new agreement to unwind the hedges and negate the current contract in place." *Id*. CASS does not appear to have responded to this email.

### 6. Discussion after the CALM purchase

Following the disagreement over whether CASS threatened to cut off aluminum shipments if PPF did not accede to its demands, the parties continued to communicate regarding the status of the unused portion of the 2008 aluminum and the yet-to-be-used 2009 aluminum. On April 13, 2009, CASS emailed PPF that it "need[s] a response as to where everything currently stands with Paccar[,]" stating that "[t]he hedges cannot be ignored or pushed out to 2010." *Id*. at 79. PPF responded that it is "trying to get PACCAR engaged but they are taking the stance that [PPF] push out the contract and use the metal they have purchased." *Id*. It is not clear if PPF was referring to the CALM aluminum or another source.

In early July 2009, PPF and CASS exchanged a series of emails regarding conversations between CASS's sales representative and a PACCAR representative and the possibility of CASS allowing PPF to carry the 2008 and 2009 aluminum over into 2010. ECF No. 106 at 13; ECF No. 108 at 9; ECF No. 107-2 at 64–65. In this exchange, CASS stated and PPF confirmed that PACCAR verbally agreed to PPF "passing through" the penalties[16] from the 2008 and 2009 sales orders to PACCAR. ECF No. 107-2 at 64.

However, CASS requested that PACCAR provide written confirmation of this agreement and confirmation that PACCAR would "consume these hedged metal units in 2010." *Id*. PPF responded that the request was not possible. It explained that PACCAR's position was that the

---

[16] Penalties likely refers to the price per pound carry-over penalty that PPF and CASS had previously agreed upon.

sales orders at issue were contracts only between PPF and CASS and that PACCAR had not agreed to purchase a certain quantity of aluminum from PPF but had rather agreed to purchase a certain quantity of finished product from PPF. *Id*. There does not appear to be a response from CASS regarding PACCAR's refusal to commit to purchasing the hedged aluminum.

Throughout the remainder of July 2009, there were a series of emails exchanged between Alcoa employees regarding the situation and direct conversations with PACCAR. ECF No. 107-1 at 213–20. On July 25, PACCAR's purchasing executive emailed an Alcoa vice president, stating that "[i]t is PACCAR's intention to consume the aluminum currently under a fixed price contract with [PPF] & [CASS] in the 2010 calendar year." *Id*. at 223.

### 7.      Discussions regarding aluminum purchases in 2010

CASS emailed PPF in October 2009 to "address" the carry over of the 2008 and 2009 aluminum into 2010. ECF No. 108-4 at 111. After several follow-up emails, PPF responded in early November, stating that it would begin consuming the aluminum in early January 2010. *Id*. at 117. From December 2009 through early March 2010, CASS contacted PPF seeking an answer on when PPF would begin placing orders. ECF No. 108 at 10. On March 27, PPF informed CASS that it would commit to "start taking one load [of aluminum] per month . . . with the possibility to take additional quantity or pay for the unused hedges" at the end of 2010. ECF No. 108-4 at 128.

On March 29, 2010, PPF sent CASS a purchase order requesting 40,000 lbs. of aluminum per month for three months, starting April 30, 2010. ECF No. 108-7 at 122. However, the price per pound cited on the order was lower than the price per pound required in the 2008 sales order, even without the per-month carry-over penalty. ECF No. 108 at 10. CASS responded by emailing PPF the correct price and enclosing a sales order for PPF's signature. *Id*. at 11. After PPF failed to return the form, CASS emailed PPF asking for an update but received no response. *Id*. (citing ECF No. 108-4 at 140–41).

On May 19, 2010, PPF emailed CASS confirming its "intent to fulfill the contract for Aluminum hedges[,]" stating that it would "consume these hedges by taking receipt of the tonnage or unwinding them . . . ." ECF No. 108-4 at 144. Alcoa's sales director, who was copied

on this email, responded by asking if PPF would be issuing orders that day, stating that it would no longer be carrying over the hedges and requesting a physical delivery schedule. *Id*. Alcoa further stated that, if it did not receive an order from PPF that afternoon, it would generate an invoice the following day for the cost of unwinding the hedges, plus the carry-over penalties. *Id*.

Apparently acceding to Alcoa's demand, PPF sent CASS a purchase order that same day requesting 40,000 lbs. of aluminum per month for two months, starting June 30, 2010. ECF No. 108-7 at 124. The price per pound listed in the order was once again below the price fixed by the 2008 sales order, even without the carry-over penalty. *Id*. CASS emailed PPF on May 24, confirming whether the purchase order was related to the 2008 sales order and asking how PPF calculated the price per pound. ECF No. 108-4 at 148.

### 8. Alcoa unwinds the 2008 and 2009 sales orders and invoices CASS

On May 24, 2010, Alcoa invoiced CASS for $1,041,352.60, which represented the cost of unwinding the hedges for a combined 1,989,990 lbs.[17] of unused aluminum from the 2008 and 2009 sales orders, plus the carry-over penalties. ECF No. 108 at 12.

That same day, CASS emailed Alcoa, stating that it had "worked with Alcoa under the impression that Paccar / PPF would have until the end of the year to consume or unwind the outstanding hedges." ECF No. 107-1 at 66. CASS further stated that its "understanding from reading the contracts is that [CASS was] allowed to roll the hedges forward until year end and would appreciate Alcoa doing so." *Id*. Alcoa responded that "there is no contract from Alcoa which permits hedges to be rolled forward until year end . . . ." *Id*. at 65.

On June 24, 2010, CASS paid Alcoa the complete invoiced amount. ECF No. 108 at 12. CASS maintains that it did so in order to preserve its credit with Alcoa. *Id*.

///

///

---

[17]  Of the 3,060,000 lbs. of aluminum ordered under the 2008 sales order, PPF failed to purchase 437,094 lbs. ECF No. 108 at 5. However, CASS is only seeking recovery for 405,000 lbs. And while PPF failed to purchase the entire 1,587,000 lbs. of aluminum ordered under the 2009 sales orders, CASS is only seeking recovery for 1,584,990 lbs. *Id*. at 6. Thus, the 1,989,990 lbs. of unwound aluminum represents the sum of these two lower figures.

**9.     Continued conversations regarding the hedged aluminum**

On June 3, 2010, representatives for CASS and PPF met to discuss the status of the unpurchased hedges, as well the unpaid invoice balance at issue in CASS's second claim. ECF No. 109 at 6. On June 16, CASS sent PPF a follow-up email. In regards to the unpurchased aluminum, CASS stated that "[i]t was made clear at our last meeting . . . [that] the $1,041,352.60 cost to unwind the hedges must be addressed in a repayment plan presented to PPF." ECF No. 108-7 at 33. In relevant part, PPF responded on June 18, stating that "[i]t is [PPF's] intention to consume or unwind these hedges based off the contract between [PPF] and CASS. This is completely independent of any agreement CASS may have with Alcoa . . . ." *Id*. at 32.

On August 2, 2010, PPF emailed CASS a letter stating that it sought to unwind a portion of the remaining hedged aluminum. ECF No. 108-5 at 17 (citing ECF No. 108-7 at 140). CASS responded by email, disputing some of PPF's calculations. *Id*. at 17–18 (citing ECF No. 108-7 at 142). PPF does not appear to have immediately responded.

On December 30, 2010, PPF's counsel sent a letter to CASS's counsel. *Id*. at 18 (citing ECF No. 108-7 at 146). In regards to the unpurchased aluminum, PPF again offered to unwind some or all of the remaining hedges based on its calculations. *See* ECF No. 108-7 at 147. CASS does not appear to have responded.

**B.     Second breach-of-contract claim**

CASS's second claim is based on the fact that PPF did not fully pay for several shipments of aluminum that it purchased against the 2008 sales order. While PPF does not dispute any of the facts below, it argues that the statute of limitation bars this claim.

Due to a history of late payments, PPF and CASS negotiated new payment terms in late 2008. On November 18, 2008, CASS emailed PPF, listing the terms agreed upon by both companies' CEOs. ECF No. 108-7 at 29–30. CASS would charge PPF a 12% annual interest rate on invoices that were 90 days overdue after January 1, 2009, and the same rate for any invoices

///

///

///

14

60 days overdue after June 1, 2009. *Id.* at 29. PPF confirmed these terms in its response.[18] *Id.* at 30.

As discussed immediately above, CASS emailed PPF on June 16, 2010, regarding the outstanding balance, which then totaled $640,437.84. ECF No. 109 at 6. CASS asked PPF to provide it a repayment plan, and, in the context of this claim, PPF responded on June 18 that it would "continue to meet [its] obligations to CASS." *Id.* (citing ECF No. 108-7 at 32).

A month earlier, PPF had sent CASS a check for $5,000 as partial payment against this debt. *Id.* (citing ECF No. 108-6 at 29). On July 9, 2010, PPF sent another $5,000 partial payment. *Id.* (citing ECF No. 108-6 at 30). These were the last payments PPF ever sent CASS. *Id.* at 7.

## C. Procedural history

CASS filed suit in this court on December 23, 2013. ECF No. 1. The second amended complaint ("SAC") is the operative complaint in this action (ECF No. 51), and after the court partially granted PPF's last motion to dismiss (ECF No. 52), the following claims remain: (1) first breach-of-contract claim; (2) second breach-of-contract claim; (3) breach of the implied covenant of good faith and fair dealing; (4) quantum meruit; and (5) unjust enrichment. *See* ECF No. 62 (dismissing CASS's account-stated claim with prejudice).

On March 6, 2017, the court held a hearing on the instant motions for summary judgment.

## II. Motions for summary judgment

Both parties have moved for summary judgment on CASS's two breach-of-contract claims. Because their arguments are largely overlapping, the court will simultaneously address both parties' motions regarding these claims. The court will also address PPF's laches and estoppel defenses regarding both claims, as well as the remainder of its summary-judgment motion regarding CASS's remaining claims: quantum meruit, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.

_____

[18] As discussed above, CASS makes no mention throughout this second claim of a "weekly payment plan" for PPF. *See supra* § I.A.3.

15

## A. Legal standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cty of Tuolumne v. Sonora Cmty. Hosp*., 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc*., 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id*. at 252.

///

## B. Applicable law

CASS argues that Nevada law applies to this case. ECF No. 109 at 9. However, CASS analyzes at least portions of its claims under Nevada common law and Nevada's codification of the Uniform Commercial Code ("UCC"), as well as California common law and its UCC. Conversely, PPF argues that the UCC applies, but it does not cite to a specific state's codification of UCC Article 2. *See* ECF No. 116 at 5.

Because the court is sitting in diversity, it must apply the forum state's choice-of-law rules. *Cleary v. News Corp.*, 30 F.3d 1255, 1265 (9th Cir. 1994). "Nevada employs the 'substantial relationship' test for determining what state's law applies in a contract case." *Tyson v. Mid-Century Ins. Co.*, No. 2:11-CV-00199-MMD, 2013 WL 690865, at *2 (D. Nev. Feb. 22, 2013) (citing *Consol. Generator–Nev., Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1253 (Nev. 1998)). This test considers five factors: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* (citing *Consol. Generator–Nev*, 971 P.2d at 1253–54). Additionally, the application of the state's law must not violate "a strong public policy of Nevada." *Consol. Generator–Nev*, 971 P.2d at 1254.

Here, the contracts at issue were negotiated and executed in Nevada, and the aluminum was shipped to PPF in Nevada. ECF No. 109 at 8–9. While CASS is a California corporation, PPF is a Nevada corporation that operates in Nevada. Because almost all considerations weigh in favor of Nevada law, the court will apply it.

The next issue is what form of Nevada contract law applies: the state's common law or its codification of UCC Article 2. The latter applies to the sale of goods, NRS 104.2102, which Nevada's UCC defines as "all things (including specially manufactured goods) which are movable . . . other than the money in which the price is to be paid, investment securities (Article 8) and things in action." Nev. Rev. Stat. § 104.2105. During the hearing, PPF argued that the contracts at issue dealt solely with the sale of aluminum, which is a good. PPF has also argued that the sales orders included a choice-of-law provision, which selected the UCC. ECF No. 116

17

at 5. However, the sales orders mistakenly stated that any "dispute will be subject to the *Universal* Commercial Code (UCC)" rather than the *Uniform* Commercial Code. *E.g.*, ECF No. 107-1 at 9. Conversely, CASS argued during the hearing that, because the sales orders involved forming a hedge for aluminum that was yet to be delivered, the sales orders did not truly deal with the sale of goods.

The court finds CASS's argument unavailing. While both parties were aware that CASS would need to enter into a hedge arrangement in order to guarantee PPF a fixed price of aluminum, the parties entered into the contracts in order for CASS to sell aluminum to PPF. All of the material terms deal with that sole issue: the buying and selling of aluminum. Nevada's UCC therefore applies to this action.

**C.      Count 1: first contract claim (failure to order hedged aluminum)**

This first claim collectively addresses the alleged breach of seven different contracts: the consolidated version of sales order 17675 that originally called for aluminum delivery starting in 2008 (i.e., the "2008 sales order"), and the five separate sales orders and one email-based order that called for aluminum delivery starting in 2009 (i.e., the "2009 sales orders"). Both parties have moved for summary judgment on this claim. PPF argues that the claim is barred by the statute of limitations and that, even if this were not the case, it did not breach the sales orders.

As discussed in detail below, the court ultimately finds that genuine disputes of material fact exist and that it must therefore deny both parties summary judgment. One such dispute results from the fact that neither party has provided a clear version of what they believe the final terms of the 2008 sales order were. There appears to be a dispute as to whether, pursuant to the modification[19] of the 2008 sales order during mid-2009, PPF was allowed to carry over the 2008 aluminum at a penalty until the end of 2009 or only until the end of February 2009. *See supra* § I.A.1. Moreover, PPF claims that CASS repudiated the 2008 sales order in February 2009—an issue discussed in more detail below—but both parties continued to negotiate over this contract

---

[19]  The parties do not dispute that the agreement in mid-2008 to allow CASS to carry over the 2008 aluminum into at least some portion of 2009 at a penalty was a valid contract modification. Unlike the traditional common-law rule, "an agreement modifying a contract . . . needs no consideration to be binding" under the UCC. Nev. Rev. Stat. § 104.2209.

during mid-2009. The record appears to establish that both parties—along with Alcoa and PACCAR—reached a consensus that PPF would be allowed to purchase the 2008 aluminum, along with the 2009 aluminum, in 2010 and that CASS was clearly expecting PPF to place orders against the 2008 sales order throughout 2010. *See supra* § I.A.6–7.

While it appears to the court that these undisputed facts establish that the parties modified the 2008 sales order in mid-2009 to allow for PPF to carry over the 2008 aluminum into 2010, neither party has addressed this issue in their briefings. And neither party provided illumination on this issue during the hearing when the court asked what each party's understanding was as to how long PPF could continue to carry over the 2008 aluminum. As demonstrated below, this unresolved factual question prevents the court from ascertaining when PPF breached, if ever, the 2008 sales order, which is critical to both the statute of limitations and the claim's merits.

And although this specific issue does not affect the 2009 sales orders, it is also unclear to the court whether, after Alcoa unwound the contracts, CASS refused to allow PPF to place orders against the 2008 and 2009 sales orders and thus potentially repudiated these contracts. Summary judgment is thus unwarranted for either party on this first claim.

Before addressing the claim's merits, the court will address the defenses that PPF has raised.

### 1.    Statute of limitations

The statute of limitations under Nevada's UCC is "4 years after the cause of action has accrued." Nev. Rev. Stat. § 104.2725. "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id*. CASS filed its claim in this court on December 23, 2013.

PPF argues that the statute of limitations would have begun to run for the 2008 sales order at the end of 2008, asserting that CASS alleges that PPF breached this contract by not purchasing the contracted aluminum by the end of that year. ECF No. 107 at 19. PPF similarly argues that the statute of limitations would have begun to run at the end of 2009.[20] *Id*. at 20.

---

[20] More specifically, PPF argues that CASS has alleged nine successive breaches for the 2009 sales orders, which occurred the first of each month from April 1, 2009 to December 1, 2009.

However, this argument mischaracterizes CASS's allegations. CASS has always acknowledged that the modification of the 2008 sales order allowed PPF to carry over the unused aluminum from this contract into at least some portion of 2009. CASS has similarly acknowledged that the 2009 sales orders explicitly allowed for carry over into 2010.

Instead, CASS argues that the statute of limitations could not have begun to run until June 2010, when it paid Alcoa for the cost of unwinding the 2008 and 2009 sales orders. ECF No. 118 at 6. In making this argument, CASS focuses solely on when it incurred damages from the alleged breach; however, CASS never makes clear when it believes that PPF breached any of the sales orders. This is partially a result of the fact that neither party has clarified whether the 2008 sales order was modified a second time in mid-2009 to allow PPF to carry over the unused 2008 aluminum into 2010.

Regardless, in either possible scenario, CASS's claim regarding the 2008 sales order falls within the UCC's four-year statute of limitations. If the 2008 sales order was *not* modified to allow for 2010 carry over—and thus only allowed for carry over of 2008 aluminum into 2009— then the contract was allegedly breached on January 1, 2010. Similarly, if the contract was modified to allow for 2010 carry over of 2008 aluminum, then the alleged breach only occurred on January 1, 2011, and CASS's claim is also within the four-year window.

As for the 2009 sales orders, the contracts explicitly allowed PPF to carry over any unused portion of the 2009 aluminum into 2010 at a penalty. Although acknowledging the similar provision in the 2008 sales order for carry over of the 2008 aluminum into 2009, CASS seems to ignore—at least in certain points in its briefing—this explicit provision in the 2009 sales orders. *E.g.*, *ECF* No. 108 at 15. CASS thus argues that the 2009 sales orders were breached when PPF "failed to take the aluminum during the 2nd-4th quarters of 2009 . . . ." *Id*. But because there is no genuine dispute that PPF was allowed to carry over the 2009 aluminum

---

ECF No. 108 at 207. PPF cites to a CASS spreadsheet that divides the total amount of unordered 2008 aluminum evenly per month for April through December 2009. ECF No. 51-7 at 2. This spreadsheet has no context, so PPF's argument is unclear. However, CASS has never alleged or argued that there were separate breaches of the 2009 sales orders.

into 2010, the statute of limitations only began to run on the 2009 sales orders after 2010. CASS's claim for these sales orders thus falls within the statute of limitations.

### 2. Breach of contract

CASS argues that PPF breached the 2008 sales order by failing to order the 2008 aluminum during 2008 or 2009 and breached the 2009 sales orders by failing to order the 2009 aluminum during 2009 or 2010. ECF No. 108 at 15–16. CASS further argues the PPF breached both sets of contracts by failing to pay the penalties on carrying over the 2008 and 2009 aluminum past 2008 and 2009 respectively, failing "to provide a schedule for delivery in 2010," and failing "to take the aluminum in 2010 . . . ." *Id*. PPF responds that CASS repudiated the contracts by conditioning continued aluminum delivery on PPF acceding to additional contract terms. PPF also argues that the unwinding costs that CASS paid to Alcoa are consequential damages, which are not granted to sellers under the UCC, and that PPF is thus not liable to CASS. The court will address these two arguments before analyzing whether PPF breached the contracts.

### a. Repudiation in February of 2009

PPF has consistently asserted throughout the briefings that CASS repudiated the contracts during the February 2009 conference call when CASS demanded that PPF convince PACCAR to sign contracts agreeing to immediately purchase or unwind the 2008 aluminum and modify the carry-over provision in the 2009 sales orders. ECF No. 115 at 22. A repudiation is "[a] contracting party's words or actions that indicate an intention not to perform the contract in the future." REPUDIATION, Black's Law Dictionary (10th ed. 2014). "When either party repudiates the contract with respect to a performance not yet due[,] the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . suspend his or her own performance" or "[r]esort to any remedy for breach . . . ." Nev. Rev. Stat. § 104.2610 (codifying U.C.C. § 2-610).

A party's demand "for more than the contract calls for in the way of counter-performance is not in itself repudiation. . . . However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a

repudiation." U.C.C. § 2-610 (comment 2) (Unif. Law Comm'n); *see also* Restatement (Second) of Contracts § 250 (comment 2) (Am. Law Inst. 1981).

PPF's argument fails to establish that it is entitled to summary judgment for several reasons. First, there is clearly a genuine dispute of fact as to whether CASS presented these demands as an ultimatum. Contrary to PPF's version of events, CASS asserts that it conditioned continued aluminum shipments on PPF's continued payment on the balances for overdue invoices. Thus, even if this anticipatory-repudiation defense could potentially excuse an alleged breach, the defense is not appropriate for summary judgment.

Moreover, even if CASS had conditioned its performance on PPF and PACCAR acceding to its demands, it is not clear how the parties' conduct after early 2009 affected PPF's obligation to purchase the aluminum under the 2008 and 2009 sales orders. While neither party addresses this point, it is possible that CASS retracted its alleged repudiation—assuming it even occurred—by communicating to PPF in March 2009 that it never threatened to stop shipping aluminum over its contract demands and continuing to request that PPF place aluminum orders. *See* Nev. Rev. Stat. § 104.2611 ("Until the repudiating party's next performance is due[,] the repudiating party can retract his or her repudiation unless the aggrieved party has since the repudiation cancelled or materially changed his or her position . . . .").

While PPF argues that, even after the March 2009 emails, CASS continued to make demands of PPF, it appears that there was a consensus by July of that year that PPF would continue to purchase the 2008 aluminum throughout 2009 and possibly into 2010. Thus, PPF has failed to show that the undisputed facts establish that CASS repudiated the 2008 sales order during the February 2009 conference call and failed to timely retract that repudiation.

### b. Consequential damages

PPF also argues that CASS has failed to establish the damages element in this breach-of-contract claim because the unwinding costs that Alcoa incurred—and thus charged CASS for— are consequential damages, which are not recoverable by *sellers* under the UCC. *See Associated Metals & Minerals Corp. v. Sharon Steel Corp.*, 590 F. Supp. 18, 21 (S.D.N.Y. 1983) ("It is . . . well settled that the UCC does not provide the remedy of consequential damages for aggrieved

sellers."); *see also* Nev. Rev. Stat. § 104.1305 (not allowing for consequential damages "except as specifically provided in the Uniform Commercial Code or by other rule of law.").

Under the UCC, consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ." Nev. Rev. Stat. § 104.2715(2); *see also* 11 Joseph M. Perillo, *Corbin on Contracts* §§ 60.16, .19 (Joseph M. Perillo, ed.) (Matthew Bender). In contrast, the UCC's standard measure of damages for a seller when the buyer fails to pay for the contracted goods "is the difference between the market price at the time and place for tender and the unpaid contract price." Nev. Rev. Stat. § 104.2708(1).

Here, the damages that CASS incurred was the cost of unwinding the hedges, which even PPF defines as the difference between the metal's contract price and its market price at the time of the contract's rescission. ECF No. 106 at 8. The court finds that these costs are not consequential damages but rather the standard measure of compensatory damages for an aggrieved seller under the UCC. If a buyer such as PPF fails to purchase a contracted quantity of a good and the good's market (i.e., spot) price falls below the contracted fixed price, a seller such as CASS could only mitigate its damages by selling the good to another buyer at the market price. CASS argues that this is precisely the damages the unwinding costs represent. ECF No. 118 at 27–28.

The court agrees. Moreover, the fact that Alcoa was the entity that initially incurred this cost and then passed it on to CASS as the intermediary re-seller does not alter this analysis on the *nature* of CASS's damages.

However, because both parties are being denied summary judgment on this claim, the court makes no finding as to whether the $1,041,352.60 that Alcoa invoiced CASS is the correct *amount* of CASS's damages. For example, as discussed below, it is possible that PPF breached the 2008 and 2009 sales orders at the end of 2010 by failing to purchase the remaining aluminum by the year's end. Under this scenario, the correct measure of damages may be the contract price minus the market price at that point in time.

///

### c. Alleged breach of the sales orders

Neither party has provided a clear, complete narrative of events or a clear understanding of their respective positions on key factual and legal issues. The court has therefore blended the narrative from both parties' summary-judgment motions and bridged some gaps with a thorough review of the record. Based on this review, the court distills the parties' arguments into two conflicting narratives. PPF contends that it did not breach either the 2008 or 2009 sales orders because CASS repudiated these contracts when CASS demanded that PPF reimburse it for the unwinding costs that it had paid to Alcoa. *See, e.g.*, ECF No. 115 at 16. Conversely, CASS contends that PPF breached the sales orders by not ordering the remainder of the hedged aluminum by the end of 2010 and not paying the carry-over penalties. *See, e.g.*, ECF No. 108 at 13.

These arguments are based on two issues that are either disputed or unclear: (1) whether CASS, by asking PPF to reimburse it for the unwinding costs it had paid to Alcoa, was refusing to continue shipping aluminum to PPF for the remainder of 2010 and (2) whether, as discussed above, the 2008 sales order had been modified to allow PPF to carry over the 2008 aluminum beyond 2009 and into 2010 (similar to the 2009 sales orders).

Turning to the first point, PPF contends that, once Alcoa unwound its hedged contracts, CASS demanded payment from PPF for its damages and denied PPF the opportunity to place aluminum orders for the remainder of 2010. *See, e.g.*, ECF No. 115 at 16–17 ("Again, the unwinding of the hedges meant that the metal would not be delivered. . . . CASS' . . . assertion . . . that it remained willing to ship aluminum to PPF is absurd."). If the undisputed facts demonstrated this to be true, then CASS would have repudiated the *2009* sales orders because their explicit terms allowed CASS to carry over this order into the end of 2010.[21] Under this scenario, at the time that Alcoa unwound the hedges and CASS demanded reimbursement, PPF was contractually entitled to approximately seven more months to purchase as much of the

---

[21] CASS has not presented evidence or even asserted that PPF was not contractually entitled to carry over the 2009 aluminum until the *end* of 2010.

remaining aluminum as possible. By preventing PPF from performing, CASS would be the breaching party.

But turning to the second point, there is another layer of disputed facts regarding the *2008* sales order. As discussed above, it is unclear to the court whether the parties, pursuant to their conversations during June through July of 2009, expected PPF to finish purchasing the 2008 aluminum by the end of December 2009 or by the end of December 2010. This term is material because, like the 2009 sales orders, CASS would have repudiated the 2008 sales order if (1) PPF was contractually entitled to carry over the 2008 aluminum until the end of 2010 at a penalty and (2) CASS refused to allow PPF to purchase aluminum after Alcoa's unwinding.

Nonetheless, CASS disputes the assertion that it refused to continue shipping aluminum to PPF after the unwinding,[22] and the record does not exclude either version of events. For example, in the email exchange during June 2010 following the meeting between CASS and PPF representatives (*see supra* § I.A.9), the parties appear to have been operating under different expectations. By asking for reimbursement of the unwinding costs, CASS does not appear to have contemplated continuing to ship aluminum to PPF; rather, it appears that CASS expected payment for the full measure of damages (i.e., contract price minus the market price) that Alcoa passed on to CASS. However, PPF responded by committing to continue purchasing or unwinding the remaining aluminum. PPF also follows up on this commitment by offering to unwind part or all of the hedges in August and December of 2010.

Conversely, the record does *not* establish that CASS was unwilling to continue selling aluminum to PPF throughout the remainder of 2010. After all, CASS responded to PPF's August letter regarding unwinding by providing unwinding-cost calculations that PPF later disputed in its December correspondence. Further compounding the lack of clarity regarding these communications, neither party has explained what unwinding the hedges would entail after

---

[22] For example, CASS asserts that, "[b]y paying the $1,041,252.60 invoice, CASS remained positioned to continue to order from Alcoa in the future and maintain its business relationship with this key supplier. CASS never stated to PPF that it would not ship the aluminum to PPF pursuant to the 2008 and 2009 Sales Orders' terms." ECF No. 108 at 12–13 (internal citation omitted).

Alcoa had already unwound its contracts with CASS. One possible interpretation of these communications is that CASS would buy other aluminum from Alcoa or another supplier at the spot-market rate and continue selling it to PPF at the contracted prices plus penalties that the sales orders established. But neither party has provided illumination on this issue, and it is improper for the court to make such critical assumptions at the summary-judgment stage.

In summation, because the record is unclear and does not eliminate the possibilities that PPF breached the sales orders or alternatively that CASS repudiated them, both parties have failed to demonstrate that they are entitled to judgment as a matter of law on this claim. The court will therefore deny both parties summary judgment on CASS's first contract claim.

### D.    Count 2: second contract claim (failure to pay for ordered aluminum)

CASS claims that PPF failed to pay the balance for ten invoices stemming from ten separate orders that PPF placed and received under the 2008 sales order between November 2008 and March 2009.[23] CASS asserts that the total unpaid balance on these invoices is $625,427.84, which PPF does not dispute. Instead, PPF argues that the 2008 sales order was an installment contract and that, because payment was due on each invoice within thirty days of each order, PPF's non-payment resulted in multiple breaches that began to run between December 2008 and April 2009. PPF argues that CASS's claim, which was filed in this court in December 2013, would therefore be barred by the UCC's four-year statute of limitations.

Conversely, CASS argues that the 2008 sales order is not an installment contract and that the statute of limitations only began to run in mid-2010 when PPF affirmed that it was committed to paying off its debt but made only one final payment in July 2010. CASS alternatively argues that, even if the sales order is an installment contract, both PPF's acknowledgement of its debt and the partial payments it made until mid-2010 tolled the statute of limitations.

///

---

[23] CASS has provided a table of these unpaid invoices. ECF No. 109 at 7. It appears that PPF only made payments on the first invoice, with over $35,000 of a $63,000 order remaining unpaid. *Id*. The combined amount unpaid for these ten invoices is $625,437.84. *Id*. PPF does not dispute any of these figures.

Finally, PPF argues that, even if the statute of limitations does not bar CASS's claim, PPF is not liable for the contractual interest on the unpaid balance because CASS has failed to allege facts underlying the claim.

Both parties have moved for summary judgment on this second breach-of-contract claim.

### 1. PPF's acknowledgment of its debt

Nevada recognizes the common-law rule that a written "promise to pay all or part of an antecedent contractual . . . indebtedness owed by the promisor is binding if the indebtedness is still enforceable or would be except for the effect of a statute of limitations." Restatement (Second) of Contracts § 82 (Am. Law Inst. 1981); *see also* Nev. Rev. Stat. § 11.390 (requiring that an "acknowledgement or promise" used as "evidence of a new or continuing contract . . . be contained in some writing signed by the party to be charged"); *Saye v. Paradise Mem'l Gardens, Inc.*, 554 P.2d 274, 275 (Nev. 1976) (addressing a party's argument that the statute of limitations "was tolled, pursuant to NRS 11.390, by an acknowledgement in the form of an affidavit signed by [the] respondent's president."). And contrary to PPF's contention at the hearing, this common-law rule applies to a UCC contract because Article 2 explicitly "does not alter the law on tolling of the statute of limitations . . . ." Nev. Rev. Stat. § 104.2725.

PPF has alternatively argued that its email does not serve as an acknowledgement of a debt because an acknowledgment must "directly, distinctly and unqualifiedly admit a willingness or intent to pay a specified debt." ECF No. 116 at 17 (citing *Saye*, 554 P.2d at 275). It contends that its email to CASS[24] does not meet this standard because there is no indication of what PPF's position is or what PPF considered its obligation to be. *Id*. CASS counters that PPF's statement about meeting its obligations to CASS does demonstrate a direct acknowledgement of a specific debt because PPF made the statement in response to CASS's email regarding the $640,437.84[25]

---

[24] PPF argues that its email is inadmissible under Federal Rule of Evidence 408(2) (ECF No. 116 at 16), which it also raises in its motion to strike. The court addresses this issue below and finds that the email is admissible.

[25] Attempting to further argue that its acknowledgment of its debt was too unspecified, PPF highlights the fact that the amount cited in CASS's original email, $640,437.84, is different than the amount that PPF alleged in its complaint: $625,437.84. ECF No. 116 at 17–18. CASS counters that the amount cited in its email had not yet taken into account $15,000 in combined

unpaid invoice balance. ECF No. 108-7 at 33 (CASS stating, "It was made very clear at our last meeting both the $640,437.84[,] which is now due[,] and the $1,041,352.60 cost to unwind the hedges must be addressed in a repayment plan presented to PPF.").

The court agrees with CASS. When the conversation between CASS and PPF is considered as a whole, it is clear that PPF is acknowledging the unpaid invoice debt and committing to pay it off. This email therefore serves as a written acknowledgment of a debt, and the statute of limitations is renewed from this date. CASS's second breach-of-contract claim is therefore timely, and the court need not address whether the sales order is a divisible contract or whether PPF's partial payments separately tolled the statute of limitations.

However, the court will address PPF's final argument that CASS failed to allege tolling in its operative complaint and is thus barred from now relying on it. CASS cites *Wasco Products., Inc. v. Southwall Technologies., Inc*. for the proposition that "federal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings . . . ." 435 F.3d 989, 991 (9th Cir. 2006). However, the Ninth Circuit in *Wasco Products* only addressed the narrow issue of whether the plaintiff, who sought to toll the statute of limitations under a civil-conspiracy theory, was required to plead civil conspiracy in its complaint. *Id*. at 989. Thus, it was the plaintiff's failure to plead the claim—rather than plead tolling itself—that barred its tolling argument.

Here, CASS pled the existence of the June 18, 2010 email in its operative complaint and asserted that "PPF acknowledged its agreement to pay CASS for the outstanding invoices . . . ." ECF No. 51 at 8. CASS is therefore not barred from arguing that the email acknowledgement renewed the statute of limitations. Accordingly, the court will grant CASS and deny PPF summary judgment on CASS's claim for the principal balance of the aluminum that PPF ordered but failed to pay for.

///

---

final payments from PPF, which would bring the total debt owed, minus interest, down to $625,437.84. ECF No. 127 at 9–10. In turn, the higher debt amount cited in CASS's email does not affect whether PPF's response serves as an acknowledgement of its debt.

### 2. Contractual interest on unpaid invoices

Based on the modification of the 2008 sales order's payment terms during November 2008 (*see supra* § II.B), CASS claims that PPF is liable at the rate of 12% interest for the unpaid invoices.[26] PPF responds that CASS's failure to plead the contract modification and the related interest bars CASS from seeking the 12% contractual interest. CASS has not responded to this argument.

"Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)). Failure to give such notice can prejudice the defendant because "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). Courts consistently reject a plaintiff's attempt to raise new claims or theories of liability at the summary-judgment stage because, "[s]imply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prod.*, 435 F.3d at 992 (quoting *Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)); *see, e.g.*, *Nolan v. Vilsack*, No. CV-1408113-ABF-FMX, 2016 WL 3678992, at *4 (C.D. Cal. June 30, 2016); *Phillips v. Target Corp.*, No. 2:14-CV-468-JCM-CWH, 2015 WL 4622673, at *4 (D. Nev. July 31, 2015).

Here, CASS did not plead the existence of the November 18, 2008 email in which the parties agreed to PPF paying 12% interest on any invoice balance unpaid beyond a certain time. By failing to allege these facts, CASS failed to give PPF notice that it was intending to seek this interest, thus likely prejudicing PPF. Accordingly, CASS will be barred from seeking contractual interest on the unpaid invoice balance.

///

---

[26] Specifically, CASS asserts that "the interest owed, calculated from the day following the payment due date on each invoice through December 31, 2015 is $485,051.77" and that "[t]he interest accrued daily for the combined invoices in 2016 is $199.99." ECF No. 109 at 7.

PPF, however, has not disputed that CASS is entitled to *statutory* pre-judgment interest on this claim, and the court finds that CASS would be entitled to such interest. *See Schoepe v. Pac. Silver Corp*., 893 P.2d 388, 389 (Nev. 1995) ("[P]rejudgment interest is recoverable as a matter of right in actions upon contracts for all money from the time it becomes due.").

### E.    Laches and estoppel on the first and second breach-of-contract claims

In response to CASS's motions for summary judgment on its first and second breach-of-contract claims, PPF briefly argues that the equitable defenses of laches and estoppel apply and create genuine disputes of material fact. ECF No. 115 at 29; ECF No. 116 at 21–22. "Laches is an equitable doctrine which may be invoked when delay by one party works to the disadvantage of the other, causing a change of circumstances which would make the grant of relief to the delaying party inequitable." *Miller v. Burk*, 188 P.3d 1112, 1125 (Nev. 2008) (citation and quotation marks omitted). In determining whether the defense applies, Nevada courts consider "(1) whether the party inexcusably delayed bringing the challenge, (2) whether the party's inexcusable delay constitutes acquiescence to the condition the party is challenging, and (3) whether the inexcusable delay was prejudicial to others." *Id.*

PPF argues that it is prejudiced by CASS's delay in bringing suit because (1) the contract at issue was executed in 2007 and there are allegedly no documents regarding its formation; (2) the PPF employees involved in the contract negotiations, Ray Switzer and Lono Hagman, are no longer employed at the company; and (3) PPF was financially impacted when it carried the debt as a liability until August 2013, at which point it reported the amount as income.

These arguments are unavailing. While PPF asserts that it has no documents regarding the formation of the 2008 sales order, it has provided emails regarding the relevant modification of the contract in mid-2008 and has not highlighted what specific facts about the contract formation PPF is now unable to prove. In regards to the two employees, CASS counters that both parties deposed Switzer in June 2015 and that PPF originally noticed and then cancelled Lono Hagman's deposition. ECF No. 127 at 19. Finally, CASS argues that any tax liability that PPF incurred cannot be considered prejudice because (1) PPF could have simply paid off the debt and

(2) PPF received over $625,000 in goods that it did not pay for. The court agrees with CASS and finds that PPF's laches defense is inapplicable.

In regards to estoppel, PPF has not cited any legal authority or facts as to why this equitable defense applies. Because PPF has the burden of establishing an affirmative defense, this alone precludes relief. Moreover, the court cannot identity any facts that justify the doctrine's application. In order to establish estoppel, a party must prove, inter alia, that it "relied to [its] detriment on the conduct of the party to be estopped." *Mahban v. MGM Grand Hotels, Inc.*, 691 P.2d 421, 423 (Nev. 1984). PPF has not alleged any conduct that satisfies this element. Therefore, PPF's laches defense is also inapplicable.

### F.    Count 4: breach of the implied covenant of good faith and fair dealing

PPF has moved for summary judgment on this claim. "It is well established that all contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other." *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007); *see also* Nev. Rev. Stat. § 104.1304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."). Where one party to a contract "deliberately contravenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919, 923 (Nev. 1991).

To succeed on a claim for breach of the implied covenant, a plaintiff must (1) identify the contract that is the basis for the claim, (2) identify the conduct that allegedly constituted the breach of the covenant, (3) indicate that this conduct was deliberate, and (4) show how the alleged breach caused damage. *See Morris v. Bank of Am. Nev.*, 886 P.2d 454, 457 (Nev. 1994). A defendant can be liable for breach of the implied covenant even if it is determined that the defendant did not breach the underlying contract. *Id*. at 457 n. 2 ("Whether a breach of the letter of the contract exists or not, the implied covenant of good faith is an obligation independent of the consensual contractual covenants.").

///

"[G]ood faith is a question of fact." *Consol. Generator–Nev*, 971 P.2d at 1256. However, "when there is no factual basis for concluding that [a defendant] acted in bad faith, a court may determine the issue of bad faith as a matter of law." *Andrew v. Century Sur. Co.*, No. 2:12–cv–0978, 2014 WL 1764740, at *10 (D. Nev. Apr. 29, 2014) (citing *Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1355 (Nev. 1986)).

CASS alleges in its operative complaint that PPF breached the implied covenant by failing to purchase the full amount of aluminum that it ordered under the 2008 and 2009 sales orders. ECF No. 51 at 10. It further argues in its response to PPF's summary-judgment motion that PPF breached the covenant by purchasing aluminum from CALM instead of from CASS under the 2008 sales order. ECF No. 118 at 29. CASS asserts that PPF saved 1.5 million dollars by purchasing aluminum from CALM through the spot market at a rate lower than the price fixed under the hedges. *Id*. Conversely, PPF argues that CASS itself breached the implied covenant by threatening to discontinue shipping aluminum if PPF did not accede to modifying the terms of the 2008 and 2009 sales orders.[27] ECF No. 107 at 28–29.

Summary judgment is improper for this claim. Whether PPF acted in good faith when it ordered aluminum from CALM based on CASS's alleged threat to discontinue aluminum shipments is a question of fact for a jury. Similarly, a reasonable jury could conclude that PPF acted in bad faith when it failed to place even a single aluminum order with CASS during 2010, even after it had affirmed in mid-2009 that it would order the remaining 2008 and 2009 aluminum during 2010. The court will therefore deny PPF's motion for summary judgment on this claim.[28]

///

///

///

---

[27] PPF has not filed a counterclaim.

[28] PPF also argues that the statute of limitations bars this claim but bases its assertion on the arguments it raised for CASS's breach-of-contract claims. Thus, the court similarly finds that the claim is not barred.

### G. Counts 5 & 6: unjust enrichment and quantum meruit

PPF has moved for summary judgment on CASS's unjust enrichment and quantum meruit claims.[29] The theory of quantum meruit is based upon the premise that, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof. *See Hannon v. Wells Fargo Home Mortg.*, 2012 WL 2499290, *6 (D. Nev. June 26, 2012). To establish a quantum meruit claim, "a plaintiff must show she conferred a benefit on the defendant, and the defendant appreciated, accepted, and retained the benefit under circumstances such that it would be inequitable for him to retain the benefit without paying for it." *In re Wal–Mart Wage and Hour Employ. Pract. Litig.*, 490 F. Supp. 2d 1091, 1125 (D. Nev. 2007). However, a claim for quantum meruit is not actionable when the claim is based on an express contract. *See Mobius Connections Grp., Inc. v. TechSkills, LLC*, No. 2:10-cv-1678, 2012 WL 194434, *8 (D. Nev. Jan. 23, 2012); *see also Leasepartners Corp. v. Robert L. Brooks Trust*, 113 Nev. 747, 756 (1997).

CASS bases both claims on the undisputed fact that (1) PPF received aluminum from CASS that PPF did not pay for and (2) PPF failed to order 1,989,990 lbs. of hedged aluminum. ECF No. 51 at 10–11. CASS's unjust-enrichment and quantum-meruit claims are thus solely based on the same express contracts that underlie its two breach-of-contract claims. Because there is no dispute that the 2008 and 2009 sales orders are valid contracts, the court must grant PPF summary judgment on these two claims.

In reaching this conclusion, the court finds that it is necessary to clarify its earlier orders on PPF's motions to dismiss. In its original complaint, CASS brought unjust enrichment and quantum meruit as a single claim (ECF No. 1 at 6–7), which the court dismissed because the claim was based on the express contracts between the parties (ECF No. 25 at 8–9). In its first and second amended complaints, CASS pled the claims in the alternative to its breach-of-contract claims pursuant to FRCP 8(d)(2). ECF No. 27 at 10–11; ECF No. 51 at 10–12. In ruling on

---

[29] "Nevada treats quantum meruit claims and unjust enrichment claims very similar." *Mobius Connections Grp., Inc. v. TechSkills*, LLC, No. 2:10-cv-1678, 2012 WL 194434, *8 (D. Nev. Jan. 23, 2012).

PPF's two subsequent motions to dismiss, the court held that CASS had sufficiently pled these claims, which could "survive if CASS were unsuccessful on its express breach of contract claims." ECF No. 48 at 12; *see also* ECF No. 62 at 7. The court explained that the claims were sufficiently pled due, in part, to case law from this district that a party need not plead the existence of an implied contract in order to survive a motion to dismiss. ECF No. 48 at 12 (citing *Takiguchi v. MRI Int'l, Inc.*, No. 2:13-cv-1183, 2014 WL 4663851, at *11 (D. Nev. Sept. 18, 2014)).

However, based on the parties' current briefings, it appears that the court may not have sufficiently explained its statement that these equitable claims could survive if CASS's breach-of-contract claims failed. At the motion-to-dismiss stage, the court could not determine if the sales orders that underlie CASS breach-of-contract claims were valid contracts. Because CASS pled unjust enrichment and quantum meruit in the alternative, CASS could argue that these equitable remedies applied in the event that the court held that the sales orders were not valid contracts—not merely in the event that CASS failed to succeed on its breach-of-contract claims.

Here, at the summary-judgment stage, it is clear that there is no dispute that the sales orders were valid contracts, and the undisputed evidence supports that conclusion. In turn, CASS cannot recover under unjust enrichment or quantum meruit, and the court will therefore grant PPF summary judgment on these two claims.

**III.     Motion to strike**

Finally, PPF has moved to strike various exhibits attached to both of CASS's motions for partial summary judgment. ECF No. 117.

**A.     FRE 408 objections**

PPF argues that the June 18, 2010 email in which PPF acknowledged its debt to CASS for the unpaid invoice balance and discussed the status of the remaining unpurchased hedged aluminum (*see supra* § I.A.9) is inadmissible under Federal Rule of Evidence 408. PPF similarly argues that the rule prohibits the court from considering the content of the December 30, 2010 letter (*see supra* § I.A.9) sent from PPF's counsel to CASS's counsel.

///

Under FRE 408, "evidence from settlement negotiations may not be considered in court 'when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction.'" *Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007) (emphasis omitted) (quoting Fed R. Evid. 408(a)). But by its explicit terms, the rule does not exclude evidence of settlement negotiations not offered for prohibited purposes. *See id.*; Fed. R. Evid. 408(b). "In other words, Rule 408 is designed to ensure that parties may make offers during settlement negotiations without fear that those same offers will be used to establish liability should settlement efforts fail. When statements made during settlement are introduced for a purpose unrelated to liability, the policy underlying the Rule is not injured." *Rhoades*, 504 F.3d at 1161–62; *see also* 23 Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5308 (1st ed.) ("Rule 408 is not an absolute ban on the admissibility of evidence that falls within its scope. . . . If offered for some other purpose, the evidence is admissible.").

Here, PPF has generally objected to the introduction of both documents, but it has not addressed *how* CASS has attempted to use this evidence—cited throughout multiple filings and included in a voluminous record—to establish PPF's liability. The court will therefore address the context in which it considered both documents in its analysis above.

In regards to the June 18 email, the court primarily relied on this evidence in the context of CASS's second contract claim to determine that PPF acknowledged its debt and that the statute of limitations had therefore not run. *See supra* § II.D.1. At least one circuit court has specifically found that evidence of settlement negotiations is not prohibited when "admitted for the purpose of establishing when the statute of limitations began to run, which is separate from establishing the elements of the underlying breach of contract claim." *B & B Hardware, Inc. v. Fastenal Co.*, 688 F.3d 917, 920 (8th Cir. 2012). This court agrees with that conclusion.

The court also considered both the June 18 email and the December 30 letter in regards to CASS's first contract claim in order to determine the parties' positions regarding the status of the unpurchased aluminum after Alcoa unwound in May of 2010. *See supra* § II.C.2.c. As discussed above, the court determined that, based in part on these documents and the assertions that the

parties made in their briefings, it was unclear whether PPF was able to continue purchasing aluminum after the unwinding. The court therefore finds that this evidence was not considered for the purpose of proving or disproving PPF's liability.

The court will therefore deny PPF's motion as to both exhibits without prejudice; PPF may, if relevant, raise this issue in the future as a motion in limine.

### B.      Hearsay objection to spreadsheet of CALM invoices

Next, PPF argues that an exhibit consisting of an excel spreadsheet that lists PPF's orders for aluminum from CALM (ECF No. 108-4 at 87) is inadmissible hearsay. CASS counters that this exhibit is merely a demonstrative aid that compiles the data listed in each CALM invoice that CASS also provided as an exhibit. The court agrees and finds that the spreadsheet is an admissible demonstrative aid. *See United States v. Baker*, 10 F.3d 1374, 1410 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000); *see also United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980).

### C.      Objections to purportedly undisclosed documents

Finally, PPF argues that, because several documents attached as four different CASS exhibits are not bate stamped, they were likely undisclosed and should therefore be stricken. CASS responds by citing at what point in this litigation all but one[30] of the disputed exhibits were produced by either CASS or directly by PPF. ECF No. 128 at 8–9. The court directs the parties to meet and confer on such issues in the future before raising them as a motion.

Based on the foregoing, PPF's motion to strike will be denied.

## IV.      CASS's evidentiary objections

As a final note, the court has reviewed CASS's various objections to PPF's filings and finds that they are pro forma and do not affect the instant motions' disposition. Such objections are not required under the Federal Rules of Civil Procedure and need not be filed in the future.

///

[30] One exhibit is a spreadsheet that CASS included that calculates the amount of interest that PPF would owe on the second breach-of-contract claim. ECF No. 128 at 9. Because the court has found that CASS is barred from claiming contractual interest on this claim, this objection is moot.

**V.     Conclusion**

IT IS THEREFORE ORDERED that defendant Production Pattern and Foundry's motion for summary judgment (ECF No. 107) is **DENIED in part** as to the first breach-of-contract claim (count 1), the second breach-of-contract claim (count 2), and the claim for breach of the implied covenant of good faith and fair dealing (count 4). The motion is **GRANTED in part** as to the unjust-enrichment and quantum-meruit claims (counts 5 & 6).

IT IS FURTHER ORDERED that plaintiff CASS's motion for partial summary judgment on its first breach-of-contract claim (ECF No. 108) is **DENIED**.

IT IS FURTHER ORDERED that CASS's motion for partial summary judgment on its second breach-of-contract claim (ECF No. 109) is **GRANTED in part** in accordance with this order.

IT IS FURTHER ORDERED that Production Pattern and Foundry's motion to strike (ECF No. 117) is **DENIED**.

IT IS FURTHER ORDERED that the parties shall submit a proposed joint pretrial order in compliance with Local Rule 16-3(b) within 45 days of the date of this order.

IT IS SO ORDERED.

DATED this 23rd day of March, 2017.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE